1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEEDS LP,<br><br>          Plaintiff,<br><br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>         Defendant.<br><hr>FOURTH INVESTMENT LP,<br>         Plaintiff,<br><br>  vs.<br><br>UNITED STATES OF AMERICA,<br><br>         Defendant. | CASE NO. 08CV100; 08CV110 BTM (BLM)<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

   Plaintiffs have filed the above-captioned quiet-title actions to remove federal tax liens on real property at 3207 McCall Street, San Diego, CA  92106 ("McCall property") and on a 12.5% interest in real property at 1280 Fourth Avenue, San Diego, CA  92101 ("Fourth property").  These tax liens identify Plaintiff Leeds, L.P., ("Leeds"), the purported owner of the McCall property, and Fourth Investment, L.P., ("Fourth"), the purported owner of the Fourth property, as nominees/alter egos of Susanne C. Ballantyne.

   Plaintiffs contend that tax liens encumbering Susanne and, her husband, Don Ballantynes' property do not encumber the McCall and Fourth property.  The United States argues that the federal tax liens at issue did attach to the McCall and Fourth properties at

1   the time they arose and remain attached to the properties.

2       Having considered the testimony and evidence introduced at trial, oral argument, the

3   pre and post- trial briefs, and all other filings that are a part of the trial record, in accordance

4   with Fed. R. Civ. P. 52(a), the Court hereby issues the following findings of fact and

5   conclusions of law.

6                               **I. FINDINGS OF FACT**

7

8   **A. Introduction**

9

10      In the course of fifteen days of trial, the Court was presented with an abundance of

11  evidence that, for years, Don and Susanne Ballantyne engaged in a complex scheme to

12  frustrate IRS attempts to collect on the Ballantynes' multi-million dollar federal tax liability.

13  The Court heard evidence describing more than thirteen entities used by the Ballantynes to

14  hold their assets, including Leeds LP, Fourth Investment LP, Rhodes Investment

15  Corporation, B&B Business Services, Inc., TPH Investment LP, New Horizon Lighting LLC,

16  Eastman Investment, Fremont Corporation, Snow Valley Holdings, Inc., Hemet C. LP, Fulton

17  162 LP, Sonora Investment LP, and Mountain Living, Inc.  Although Plaintiffs take the

18  position that each of these entities is a legitimate business, operating independently from the

19  Ballantynes, the Court finds to the contrary.  Each of the entities cited above (and virtually

20  all other entities referenced at trial) was owned and controlled by the Ballantynes, their

21  children, their children's trusts, and/or Ms. Ballantyne's brother, Ed Cramer. The Court heard

22  no evidence that these entities engaged in any true independent business activity.  Instead,

23  during the time periods relevant at trial, nearly all of these entities' primary function appeared

24  to be to hold the Ballantynes' assets and/or to create additional entities to be used to hold

25  the Ballantynes' assets, in order to defeat collection efforts by the IRS and other potential

26  creditors.

27      The trusts at issue in this case are similarly controlled by the Ballantynes.  First, Ms.

28  Ballantyne was the sole trustee and beneficiary of the Susan T. Cramer Trust.  Next, the

                                    2

1  Susanne C. Ballantyne Trust is a revocable trust. (Ex. 1007.3) Because Ms. Ballantyne has

2  the right to terminate the trust and remove property from the trust, under California law, Ms.

3  Ballantyne effectively owns the property held in the trust. *See United States v. Stolle*, No.

4  CV 99-00823-GAF, 2000 U.S. Dist. LEXIS 5454, at *16 (C.D. Cal. 2000). Finally, the Court

5  finds that the trustee of the Ballantynes' children's trusts, G. William Dunster[1], did not

6  operate independently from the Ballantynes, with respect to any of the transactions

7  referenced at trial. Mr. Dunster, the only person involved in the relevant transactions in this

8  case not related to the Ballantynes by blood, was a long-time business associate and

9  confidant of the Ballantynes. (Tr. 40)

10       Stripping away the fiction that these companies and trusts are independent entities,

11  an extraordinarily complex set of facts becomes simpler. As set forth below, Don and

12  Susanne Ballantyne transferred the McCall and Fourth properties into entities within their

13  control as part of an initial attempt to render their assets more difficult to attach. The

14  Ballantynes then engaged in a series of transactions to transfer their assets to their children

15  but failed to fully relinquish control and continued to benefit from the properties at issue.

16

17  **B. Federal Tax Liens On Don And Susanne Ballantyne's Property**

18

19       Don and Susanne Ballantyne have incurred significant federal tax liability. Although

20  they owe income taxes for several tax years, the tax years for which they owe the most

21  money are 1985 and 1986.

22       On July 25, 1994, the Ballantynes petitioned the United States Tax Court challenging

23  notices of income tax deficiency sent by the IRS for those two years. (Joint Timeline at 7)

24  The Tax Court held a trial from May 8-10, 1995. (Joint Timeline at 8) On October 10, 1996,

25  the court filed an opinion stating that the Ballantynes owed deficiencies of $388,937 for 1985

26

27

28
_____

[1] Mr. Cramer and Mr. Dunster died prior to trial.

1    and $931,970 for 1986.[2]  (Stipulation No. 2)

2         On June 30, 1997, the IRS made an assessment against the Ballantynes for these

3    two tax years for a total of $1,320,907 in taxes.  (Joint Timeline at 40)  The Ballantynes' tax

4    liability for the 1985 and 1986 tax years also included millions of dollars in penalties and

5    interest. All told, the IRS calculated the Ballantynes' liability for taxes, penalties, and interest

6    for these two tax years to be $5,539,789.51 as of November 14, 1997.  *See* Stipulation of

7    Fact No. 4.

8         The IRS has made two other assessments against the Ballantynes:  (1) January 2,

9    1995, in the amount of $25,164, plus interest, for the 1990 tax year (ex. 3114); and (2)

10   November 16, 1998, in the amount of $11,515, plus interest, for the 1997 tax year (ex.

11   5003).

12        Notice and demand for payment was made, without any defect, on the same day as

13   all three assessments.  *See* August 4, 2010 Order RE Cross-Motions for Summary

14   Judgment at 16-17.  Accordingly, statutory liens attaching to all of the Ballantynes' property

15   and rights to property arose on January 2, 1995, June 30, 1997, and November 16, 1998.

16   *See* 26 U.S.C. § 6321.

17   **C.  Transfer Of McCall And Fourth Properties To Plaintiffs**

18

19        1. <u>McCall Property</u>

20

21        Susanne Ballantyne's parents built the McCall property around 1929 and they raised

22   her there.  (Joint Timeline at 1)  The property was owned by the Susan T. Cramer Trust,

23   named after Ms. Ballantyne's mother.  *Id.*  After Susan T. Cramer died, Ms. Ballantyne and

24   her brother, Ed Cramer, became the co-beneficiaries of this trust.  *Id.*  Mr. Cramer took his

25   apportioned distribution of the Susan T. Cramer trust in 1979, leaving Ms. Ballantyne as its

26   only trustee and beneficiary.  (Joint Timeline at 2)  The Susan T. Cramer Trust still owned

27   _____

28        [2] This decision was affirmed on appeal by the Ninth Circuit on February 19, 1999.
     (Stipulation No. 3)

08CV100; 08CV110 BTM (BLM)

the McCall property at that time.  *Id.*  In 1987, Susanne Ballantyne formed an intervivos trust, of which she was the sole settlor, trustee and beneficiary, called the Susanne C. Ballantyne Trust.  (Joint Timeline at 3)  The Susanne C. Ballantyne Trust's Declaration of Trust lists the Susan T. Cramer Trust as one of its assets.  (Joint Timeline at 3; Ex. 1007.37)

On June 30, 1995, less than two months after the tax trial on the 1985 and 1986 deficiencies, the Susan T. Cramer Trust transferred, via a grant deed signed by Ms. Ballantyne, legal title to the McCall property to Leeds LP (the Plaintiff here).[3]  (Ex. 1016). In exchange, the trust received a 99% limited partnership interest in Leeds.  (Ex. 1014.33). The next day, with Ms. Ballantyne signing on behalf of both entities in the transaction, the Susan T. Cramer Trust transferred all of its partnership units in Leeds to the Susanne C. Ballantyne Trust.  (Ex. 1018)

Leeds was formed six weeks before this transfer by its 1% general partner B&B Business Services, an entity controlled by Don Ballantyne.  (Ex. 1010)  Soon thereafter, on June 19, 1995, B&B withdrew as the general partner and was replaced by Rhodes Investment Corporation ("Rhodes").  (Ex. 1012)  Rhodes was another Ballantyne family company.  Ms. Ballantyne owned 100% of its shares, (Ex. 3011), and Ms. Ballantyne was listed on its stock registration as CEO, CFO, Secretary, sole director, and registered agent (Ex. 3002).  As general partner of Leeds, Rhodes – and Ms. Ballantyne in her capacity as Rhodes' president – controlled Leeds' business decisions.  *See* Tr. 744 - 745.

In short, the Ballantynes stood on both sides of the transaction transferring the McCall property.  Ms. Ballantyne effectively controlled and owned both the seller, the Susan T. Cramer Trust, and the buyer, Leeds L.P.

//

---

[3]  The United States argues that virtually every signed document produced in evidence, including this grant deed, was not prepared or signed on the date that appears on the face of the instrument.  The Court agrees that many documents are suspect in this regard.  *See, e.g.*, Ex. 3001, 3000, and 3011 (Minutes from first shareholder meeting for Rhodes dated May 22, 1995 - before Rhode's articles of incorporation was filed and shares were issued on June 14, 1995).  However, the Court need not reach the issue of whether documents were backdated.  Accepting the dates on the documents as the true date the documents were signed does not alter the Court's ultimate conclusion that Leeds and Fourth were the nominees of the Ballantynes as of the dates of each assessment.

2. <u>Fourth Property</u>

In the 1970s, Ms. Ballantyne inherited a 12.5% interest in the commercial property located at 1280 4th Avenue, San Diego, CA.  (Joint Timeline at 1)  In 1988, Ms. Ballantyne quitclaimed her interest in the Fourth property to the Susanne C. Ballantyne Trust.  (Joint Timeline at 3)

In 1979, the owners of the Fourth property, including Ms. Ballantyne, entered into a triple net lease with the tenant on the Fourth property, Golden State Sanwa Bank ("Sanwa Bank").  (Joint Timeline at 2)  Sanwa Bank loaned $900,000 to the Fourth property owners to construct the bank on this property. (Tr. 322, 968; Ex. 2043)  Sanwa Bank paid mortgage payments on this loan, as well as operating expenses on the building.  (Tr. 969)  These payments were deducted from rent owed on the building, and the balance of rent was distributed pro rata to the Fourth Property owners, generating an income stream for the Ballantynes throughout the life of the lease.   (Tr. 407-09, 964, 970-71)

 On June 30, 1995, the same day the McCall property was transferred to Leeds LP, the Susanne C. Ballantyne Trust transferred its interest in the Fourth property to Fourth LP (the other Plaintiff here).  (Ex. 2008)  As before, the Ballantynes stood on both sides of the transaction. Don Ballantyne filed Fourth LP's certificate of limited partnership in May of 1995 with B&B Business Services as general partner. (Ex. 2003)  On June 19, Rhodes, an entity owned and controlled by Ms. Ballantyne, was substituted as general partner of Fourth in place of B&B Business Services.  (Ex. 2005)  In exchange for the 12.5% interest in the Fourth property, the Susanne C. Ballantyne Trust received a 99% ownership interest in Fourth LP; Rhodes owned the remaining 1%.  (Ex. 2007.33).

**D.  Purpose Of Transfer Of The Subject Properties To Leeds And Fourth**

The Ballantynes transferred the McCall and Fourth properties into Leeds LP and Fourth LP as part of a plan to frustrate future IRS attempts to collect on the Ballantynes'

significant federal tax liabilities.  The transfer of the McCall and Fourth properties into Leeds LP and Fourth LP served no true business purpose, with the Ballantynes sitting on both sides of these transactions.  The Ballantynes' alternative explanation for these transfers, discussed below, does not overcome the conclusion that these transfers were made to defeat IRS collection efforts.  As set forth in the following section, shortly after the conclusion of the tax trial, Ms. Ballantyne had transferred approximately $1.4 million to accounts and entities that she controlled, but were not facially associated with Mr. Ballantyne or her.  Like these transfers, the Ballantynes' conveyance of the McCall and Fourth properties to Leeds LP and Fourth LP during this same time period was for the purpose of frustrating future attempts to collect on the Ballantynes' federal tax liability.

1.  Transfer Of Assets During Tax Court Trial

The Ballantynes signed documents creating Leeds, Fourth, and Rhodes between May 15, 1995 and May 26, 1995, beginning just five days after the conclusion of their tax trial. (Ex. 1010, 2003, 3000)  The transfer of the McCall and Fourth properties occurred weeks later.

These transactions were part of a flurry of activity taking place around the time of the Ballantynes' tax court trial where the Ballantynes transferred assets from their name to entities owned and controlled by them.  Beginning in November 1994, after the Ballantynes filed their tax court petition, until early 1995, Ms. Ballantyne transferred over a hundred thousand dollars from the Susanne C. Ballantyne Trust's bank account to a bank account jointly controlled by Susanne and Don Ballantyne called "B&B 18."[4]  (Tr. 733-37; Ex.

---

[4]Ms. Ballantyne testified that she transferred money to B&B 18, in order to pay Mr. Ballantyne's and her personal obligations, as "a matter of convenience."  Tr. 862-63; *see also* Tr. 1593.  However, the Ballantynes had personal checking accounts in their name at this time and Ms. Ballantyne could and did sign checks from the Susanne C. Ballantyne Trust's bank account directly.  *See* Tr. 765-66.  Paying bills with funds from these accounts would have been more convenient than transferring money into B&B 18 and then writing checks from the B&B 18 account. Contrary to the Ballantynes' explanation, the Court finds that the Ballantynes transferred money into B&B 18 because it created a level of confusion as to the legal owner of the assets that could frustrate creditor collection efforts.

1   4100.200, .202, .246-.47)   Similarly, on June 6, 1995, Ms. Ballantyne transferred over

2   $1,286,000 in notes from her trust to TPH Investments, LP ("TPH"), an entity she owned and

3   controlled.[5]   The same day, Ms. Ballantyne transferred $10,000 worth of notes to Sonora

4   Investments, LP, another entity owned by the Susanne C. Ballantyne Trust.[6]

5        Thus, the transfers of the McCall and Fourth properties to Leeds and Fourth fall

6   squarely within the Ballantynes' pattern of conveying assets to accounts facially not

7   associated with them during the period of months surrounding the tax court trial.

8

9        2.  Ballantynes' Explanation For the Transfers

10

11        The Ballantynes contend that these transfers were instead made for protection

12   against "future liabilities," such as liability for slip and fall accidents (and not liability for the

13   tax deficiencies at issue in the tax trial), and estate planning purposes. *See, e.g.*, Tr. 79, 510,

14   890.  These explanations are not credible in light of the evidence.  Plaintiffs take the position

15   that the 1985 and 1986 tax deficiencies could not be considered "future liabilities" because

16   the Ballantynes believed that they would ultimately prevail in tax court.  *See* Tr. 445; *see also*

17   Pl. Post-Trial Br. at 6-8; Trial Brief at 7.  This position lacks merit because regardless of

18   whether the Ballantynes "absolutely expected to win" the tax trial, the Ballantynes must have

19   considered the possibility that they could lose and be subject to millions of dollars in tax

20   liability.  The Court finds that it was precisely this "future liability" that the Ballantynes were

21   concerned with when they transferred the McCall and Fourth properties to Leeds and

22   Fourth.[7]

23

24        [5]On May 22, 1995, Ms. Ballantyne signed documents forming TPH.  (Ex. 3115)

25        [6] The trust held 99% of Sonora's LP units, and the general partner, Fremont
     Corporation, held the remaining 1%; Fremont, in turn, was wholly owned by the Susanne C.
26   Ballantyne Trust, at this time.  *See* Joint Timeline at 10, 11.

27        [7] Contrary to the position asserted by Plaintiffs in their post-trial brief and closing
     arguments, the fact that Ms. Ballantyne received limited partnership units in Leeds and
28   Fourth in exchange for deeding the subject properties does not defeat a finding that these
     initial transfers were made in anticipation of future tax liability.  Although the IRS could have
     theoretically sought to attach these partnership units, transfer to Leeds and Fourth allowed

1    Similarly, the purported estate planning purpose of these transfers rests in the

2  Ballantynes' desire to frustrate future attempts to collect on their federal tax liability.  As

3  described, *infra*, from 1996 to 1998, the Ballantynes engaged in a complex series of

4  transactions to transfer their assets, including their interests in Leeds and Fourth, to their

5  children in furtherance of their scheme to defeat IRS collection efforts.  Mr. Ballantyne

6  explained that the initial transfer of the McCall and Fourth properties was in preparation of

7  a later sale to their children's trusts because "the children's trusts did not want to acquire

8  direct ownership in anything.  It wanted to . . . [ac]quire entities, for the same reason,

9  because of future liabilities." Tr. 194; *see also* Tr. 304.  As above, the "future liabilities" that

10 the children's trusts sought to limit by not taking property directly from Mr. and Mrs.

11 Ballantyne were the tax liabilities at issue in the May 1995 tax trial.[8]

12

13 **E.  The Ballantynes' Retention Of The Properties' Benefits**

14

15   1.  <u>McCall Property</u>

16

17    The Ballantynes continued to live in the McCall property, despite its purported transfer

18 to Leeds until June 30, 2000.  (Joint Timeline at 52)  Plaintiffs contend that this arrangement

19 was proper because the Ballantynes lived on the property pursuant to a five-year lease

20 calling for a monthly rent of $3,000 due on the first day of each month.  (Ex. 1009; Tr.

21 ───────────────────

22 the Ballantynes to obscure their ownership of the McCall and Fourth properties.  The
   Ballantynes could – and in this case, did – affect a transfer of these partnership units to a

23 closely-related third party without realizing adequate consideration on this transfer.
   Moreover, the fact that the Susan T. Cramer Trust (an irrevocable trust) deeded the McCall

24 property to Fourth and then immediately transferred its units in Fourth to the Susan C.
   Ballantyne Trust (a revocable trust) does not alter the Court's findings on intent.  The

25 creation of Leeds and Fourth and the transfer of the subject property (as well as all other
   transactions at issue in this case) were not done with the assistance of an attorney.  There

26 is no evidence that the Ballantynes believed that keeping assets in an irrevocable trust would
   render these assets uncollectible under 26 U.S.C. § 6321.

27    [8] Mr. Ballantyne also made a passing reference to his belief that the initial transfer to

28 limited partnerships prior to sale to children's trusts would reduce estate taxes.  (Tr. 307)
   The Court finds that any concern about estate taxes was secondary to the Ballantynes'
   desire to frustrate IRS collection efforts.

509-10)

However, this lease was not the result of an arms-length transaction.  The Ballantynes stood on both sides of the lease, with Susanne Ballantyne signing for the landlord, Leeds, and Don Ballantyne signing for the tenant.  (Ex. 1009.03)

Basic terms of the lease were not adhered to.  Ms. Ballantyne acknowledged that no rental payments were made and a security deposit was not paid in 1995.  (Tr. 794-95, 769-70)  Instead, Ms. Ballantyne, and not Leeds, the purported owner, continued to pay the mortgage, as well as the insurance and other obligations for the McCall property during that year.  (Tr. 770-771, 782-83)

This arrangement continued into 1996.  Not until April of 1996 do the books of Leeds reflect any rental payments.  Ex. 1084.4; *see also* Tr. 798.  However, these rental payments still did not comply with the lease terms.  Of the fourteen payments that year, only one was for $3000, as provided by the lease, and only one was made on the due date.  Ex. 1084.4; *see also* Tr. 799-800.  It appears that, as opposed to making regular rent payments, Ms. Ballantyne was transferring money to Leeds to pay the costs of the McCall property as they arose.  *See* Tr. 794-95 ("Q:  So what we see here is when an obligation becomes due there is a deposit made into the Leeds account for approximately the same amount?  [Ms. Ballantyne:] Yes.")[9]

Similarly, rental payments in 1997 were not in compliance with the lease.  Ms. Ballantyne paid $2,900 in rent in January, March, and April, and only $1,200 in November.  (Ex. 1085.05)  Payments in June and July were made on the 20th and 14th of these months.  (*Id.*)  Contrary to the terms of the lease, no late fees were charged for these or any other late payments.  (Tr. 799, 1333-34)

---

[9] Six of these rental payments were made by Sonora and Fourth Investment purportedly on behalf of Ms. Ballantyne.  (Ex. 1084.4)  Ms. Ballantyne testified that these payments were proper because she owned these limited partnerships, and because they had the money, "it was just easier to write the checks" from these entities directly.  Tr. 787; *see also* Tr. 796-97.  However, at the time these payments were made, Hemet C - an entity Don and Susanne Ballantyne claim no interest in - was a limited partner of Sonora and Fourth.  *See* Ex. 2012, 5099.  Such payments are further evidence that regardless of their ownership structure, the entities presented at trial did not operate independently from the Ballantynes.

08CV100; 08CV110 BTM (BLM)

The Ballantynes stopped making payments altogether after November 7, 1997. (Ex. 1085.05)  Instead, the Ballantynes' children made rental payments of $900 each for the months of November and December, falling $1,200 short of the amount owed for these months.[10]  This arrangement continued in 1998, through the date of the final assessment at issue in this case. (Ex. 1086.08)  The majority of rent payments by the Ballantynes' children that year were well after the date due, although monthly rent payments did total $3,000. (*Id.*)

2.  Fourth Property

Ms. Ballantyne continued to use the revenue from the lease payments on the Fourth property for her own benefit after the transfer to Fourth LP.  On May 16, 1994, Ms. Ballantyne, as trustee of the Susanne C. Ballantyne Trust, directed that her portion of the rental income for the Fourth property be directed to her brother, Ed Cramer, to pay a personal debt that Ms. Ballantyne owed to him. (Ex. 2042)  This arrangement continued until January 16, 1996, over six months after the transfer to Fourth.  On that date, Ms. Ballantyne wrote to Sanwa Bank to redirect payment to Fourth, stating: "This letter is to authorize and direct you to make your next and future rental payments for [sic] Susanne C. Ballantyne Trust . . . into Fourth Investment, L.P. . . . . This is in lieu of depositing it into the Edward T. Cramer account." (Ex. 2044)

Ms. Ballantyne did not sign the letter on behalf of Fourth LP or acknowledge that Fourth now owned her interest in this property.  Similarly, Ms. Ballantyne testified that she did not attempt to amend the deed of trust on the triple net lease to reflect Fourth's ownership. (Tr. 1009)  Thus, although rental payments were made to Fourth from January 16, 1996 through the dates of the 1985, 1986, and 1997 tax year assessments, there is no evidence that the tenant of the Fourth property was aware of the transfer.  Accordingly, Ms. Ballantyne effectively retained the power to alter how Fourth property's income stream could

---

[10] As discussed below, as of February 1997, the children's trusts owned 99% of Hemet C.  Thus, the Ballantynes' children were making rental payments that would return to them through their indirect ownership of Leeds.

08CV100; 08CV110 BTM (BLM)

be assigned after the transfer to Fourth LP.

**F. Ownership And Control Of Leeds And Fourth During Assessment Periods**

      1.  <u>June 30, 1997 Assessment</u>

As discussed above, both the McCall and Fourth properties were transferred into entities owned and controlled by the Ballantynes on June 30, 1995.  On this date, Rhodes (an entity owned and controlled by Ms. Ballanytne) owned a 1% interest in both Leeds and Fourth as general partner and the Susanne C. Ballantyne Trust owned a 99% interest in Leeds and Fourth as limited partner.  The ownership structure of these entities remained unchanged for at least six months until Hemet C purchased a 1% interest from the Susanne Ballantyne Trust and became a limited partner of Leeds and Fourth via documents dated January 1, 1996.  (Joint Timeline at 25-26)

Hemet C is a limited partnership formed in December 1995 by Mr. Ballantyne, in his capacity as vice president of Snow Valley Holdings, Inc. ("Snow Valley").  (Joint Timeline at 22)  The Ballantynes' children's trusts owned 99% of Hemet C as limited partners and Snow Valley owned a 1% interest as general partner.  (Joint Timeline at 23)

Snow Valley, in turn, was formed in November of 1995 and was owned by the children's trusts.  (Joint Timeline at 20)  Although other family members also served as officers and directors of Snow Valley[11],  Mr. Ballantyne effectively controlled Snow Valley, as well as Hemet C, at least through November 26, 1997, when he resigned as an officer of Snow Valley.  Mr. Ballantyne was an officer and director of Snow Valley, and virtually every document presented at trial that was executed by Hemet C was signed by Mr. Ballantyne in his capacity as Snow Valley's Vice President.  *See* Ex. 1024, 1025, 1028, 1029, 2013, 2017,

---

[11] At the time Hemet C purchased a 1% interest in Leeds and Fourth, Don Ballantyne, Susanne Ballantyne, and their son, Clark Ballantyne were directors of Snow Valley.  (Joint Timeline at 21)  The Ballantynes' daughter, Laura Ballantyne was President, Don Ballantyne was Vice-President, and Susanne Ballantyne was Secretary-Treasurer.  (*Id.*)  Only Don and Laura Ballantyne had authority to execute documents on behalf of Snow Valley.  (*Id.*)

2018, 3030, 3031, 5099, 5101, 5109, and 5111.

On February 1, 1997 and April 15, 1997, respectively, Hemet C purchased the Susanne C. Ballantyne Trust's remaining 98% interests in Leeds and Fourth. (Joint Timeline at 34-37)

Thus, as of the date of the June 30, 1997 assessment for the 1985 and 1986 tax years, Ms. Ballantyne controlled Leeds and Fourth, as the owner of Rhodes, the general partner of these entities. The children's trusts owned 99% of Leeds and Fourth as the owner of Hemet C. However, the Ballantynes effectively controlled Hemet C via Mr. Ballantyne's role as an officer and director of Hemet C's general partner, Snow Valley.

2. <u>November 18, 1998 Assessment</u>

No other transactions affecting the ownership structure of Leeds and Fourth took place after Hemet C's purchase of the Susanne C. Ballantyne Trust's 98% interests in these entities. However, on November 26, 1997, Susanne Ballantyne resigned her positions in Rhodes. (Joint Timeline at 45) Accordingly, as of November 18, 1998, the date of the 1997 assessment, Ms. Ballantyne lacked legal authority to make decisions on behalf of Leeds and Fourth.

Nevertheless, Ms. Ballantyne continued to perform many of the same tasks for these entities as she had pre-resignation. Ms. Ballantyne continued to keep the books for Leeds and Fourth at least through 2004. (Tr. 665:10 -12) She continued to disburse funds from Sanwa Bank, the tenant of Fourth, and continued to sign checks for Leeds and Fourth through the end of 1999. (Tr. 1310:9 - 24; 1485-87) Given that Leeds and Fourth were essentially shell entities with no purpose other than to hold and manage the McCall and Fourth properties, Ms. Ballantyne's tasks represent a significant portion of Leeds and Fourth's activities during the time period in question.

Plaintiffs contend that Ms. Ballantyne performed these functions after her resignation from Rhodes as an employee of Ocean Business Services LLC ("Ocean Business"), a

08CV100; 08CV110 BTM (BLM)

property management company for the Ballantynes' various companies.   In response, Defendant asserts that agency agreements between Ocean Business and Leeds, Fourth, and Rhodes purportedly signed on November 24, 1997, were backdated.  *See* Ex. 1111, 2072, 3018.  As evidence to support his claim, Defendant points to the fact that there was no payment of agency fees to Ocean Business until April 21, 1998.

There is substantial evidence that these documents were backdated.  Nevertheless, as before, the issue of whether documents are backdated need not impact the Court's nominee analysis.  Taking the date on the November 24, 1997 agency agreements as true, the fact that Ocean Business performed services for approximately five months without being paid demonstrates that Ocean Business is not an arms-length business partner of Plaintiffs. To the contrary, Ocean Business is yet another Ballantyne family controlled entity.  It was formed by Don Ballantyne in March 1996 (Ex. 3125), owned by the children's trusts (Tr. 1505), originally managed by Don and Susanne Ballantyne (Ex. 3125.04), and its only clients appear to be companies owned or controlled by the Ballantyne, Cramer, or Dunster families (Tr. 1487-89).  The Court finds that a primary purpose of the agency agreement with Ocean Business was to provide Ms. Ballantyne with a mechanism to continue to serve in the same role with respect to Leeds and Fourth LP after her resignation from Rhodes.

**G. Consideration For Transfers Of McCall and Fourth Properties**

Ms. Ballantyne transferred the McCall and Fourth properties to Leeds LP and Fourth LP in exchange for a 99% ownership in these entities.  Approximately one year and a half later, Ms. Ballantyne had transferred her interests in Leeds and Fourth to Hemet C, an entity owned by her children's trusts but controlled by Don Ballantyne.

The following section details the consideration paid by Hemet C for Ms. Ballantyne's interest in Leeds and Fourth.  However, these complicated transactions can be summarized briefly.  Consideration paid by Hemet C was inadequate and largely unrealized.  With Don and Susanne Ballantyne controlling entities on both sides of the transaction, the purchase

14

price for Leeds and Fourth was reduced by Hemet C's agreement to assume unsecured debts, of dubious validity, that the Susanne C. Ballantyne Trust purportedly owed.  The remainder of the purchase price was paid in unsecured promissory notes that were immediately assigned to another entity controlled by the Ballantynes, TPH Investments LP ("TPH").   Although Hemet C appears to have made payments on these notes, TPH distributed only a fraction of these payments to the Susanne C. Ballantyne Trust before being foreclosed upon in a sham foreclosure engineered by the Ballantynes to shift assets to their children, in yet another attempt to render these assets uncollectable by the IRS.

1.  Leeds

Hemet C purchased the Susanne C. Ballantyne Trust's 98% interest in Leeds in exchange for a $248,000 promissory note and the assumption of an unsecured debt to Campbell Brown (a relative of the Ballantynes) for $75,000[12] with Mr. and Ms. Ballantyne signing for the entities on both sides of the transaction.  (Joint Timeline at 34-35; Ex. 1028) The principal on the $248,000 promissory note was immediately reduced by $176,638.32 by giving Hemet C credit for principal and accrued interest on notes to the children's trusts made by companies owned by the Ballantynes that the Susanne C. Ballantyne Trust had purportedly guaranteed.[13]  (Ex. 1039, 1043; Tr. 149-54, 574-81. 585-91, 611-12) Although the exact business purpose for these loans is unclear, *see* Tr. 222-25, 581, 589, these notes appear to originally have been made in exchange for loans the children's trusts made to these companies from 1989 to 1993.  *See* Tr. 597, 606; Ex. 1039, 1040.04-.10.

---

[12] The debt to Campbell Brown was not owed by the Susanne C. Ballantyne Trust, but rather by Don Ballantyne.  (Ex. 1033)  Mr. Ballantyne testified that this debt and his other obligations were never comingled with those of the Susanne C. Ballantyne Trust and that the trust had taken over this obligation.  *See* Tr. 134.  However, he acknowledged that there appears to be no documentation of the trust's assumption of this debt and that he has not made any payments to the trust in consideration for it taking on this obligation.  (Tr. 216-17)

[13] These notes were from the Postal store, Inc., the Postal Works, Westland Holding Corp., Timberline Cabinets, Timberline Cabinets - Utah, and San Diego Properties.  (Ex. 1039.04; Tr. 594)

1      Use of these notes as an offset on the purchase price of the Susanne C. Ballantyne

2  is problematic.  First, the assumed notes were from companies that went out of business

3  between 1992 and 1994, several years before the sale to Hemet C.  (Tr. 218-27, 591)  By

4  the terms of these notes, they were all in default - some as early as 1990.  *See* Ex. 1039.05,

5  1039.09, 1039.10.  Indeed, no payments, whatsoever, had been made on these notes as

6  of the date Hemet C assumed the obligation to pay them.  (Tr. 227, 590)

7      Second, there are serious questions as to whether the Susanne C. Ballantyne Trust

8  had, in fact, guaranteed the notes to the children's trust from these defunct companies.  This

9  guarantee was not made in writing.  (Tr. 151; 827)  During the course of trial, the Court

10  reviewed a massive amount of paperwork created by the Ballantynes to detail transfers of

11  assets between the companies they owned and controlled.  Given that the Ballantynes

12  issued notes for loans as small as $100, *see* Ex. 1039.07; Tr. 221-22, the Court questions

13  the existence of a guarantee of tens of thousands of dollars of debts without any written

14  record.  Moreover, Mr. Ballantyne testified that the notes were guaranteed when they were

15  made. (Tr. 220) However, Ms. Ballantyne testified that the Susanne C. Ballantyne Trust had

16  not purchased the companies until "the early 1990s"[14] (Tr. 578-79), after the date at least

17  four of the notes were issued.  (Ex. 1039.04, .05, .09, .10)  Because the Susanne C.

18  Ballantyne Trust was not the owner of these four businesses, there would have been no

19  basis for the trust to have made a guarantee.

20

21      2.  Fourth

22

23      Hemet C purchased the Susanne C. Ballantyne Trust's 98% interest in Fourth in

24  exchange for a $251,000 promissory note and the assumption of $66,000 in unsecured

25  promissory notes to the children's trusts, Crown Enterprises, and Eastman Investment (both

26

27      [14] Ms. Ballantyne testified that these entities were purchased using a portion of the
28  $1,094,000 that the Susanne C. Ballantyne Trust had received in a loan from Eastman
    Investment.  (Tr. 579)  Documents indicate that the loan from Eastman to the Susanne C.
    Ballantyne Trust was made on November 1, 1991.  (Joint Timeline at 4)

Ballantyne-family companies) owed by the Susanne C. Ballantyne Trust and Ms. Ballantyne, individually. (Joint Timeline at 37) As before, Mr. and Ms. Ballantyne signed on behalf of both of the entities in this transaction. (Ex. 2017)

The assumed notes were dated between July 27, 1992 and June 30, 1994. (Ex. 2023-28) All of these notes required annual interest payments. (*Id.*) As was the case with the assumed notes in Hemet C's purchase of the Susanne C. Ballantyne Trust's 98% interest in Leeds, no payments of either interest or principal were made prior to the agreement with Hemet C to assume the notes. (Ex. 2031; Tr. 383)

Two of these assumed notes from the Susanne C. Ballantyne Trust to both of the children's trusts for $20,000 each are particularly suspect. (Ex. 2023, 2024) These notes are dated December 31, 1993. (*Id.*) Ms. Ballantyne claimed that her trust needed to borrow money from the children's trusts because she needed cash to "help pay the bills." (Tr. 925-26) However, on the same day that these notes were given, the Susanne C. Ballantyne Trust wrote two checks for $20,000 each to the children's trusts (Ex. 4100.168; Tr. 990-95) Thus, $40,000 of the $66,000 in assumed notes arose from a wholly circular transfer of money between Ms. Ballantyne and her children's trusts.

On May 14, 1997, approximately one month after these notes were assumed by Hemet C., the Susanne C Ballantyne trust reduced the amount due on the $251,000 note by $21,675.76, the purported accrued interest on the assumed notes. (Ex. 2032) This reduction was not the result of a separate business transaction. Ms. Ballantyne testified that the original agreement between Hemet C and the Susanne C. Ballantyne Trust to assume this debt did not include any assumption of the accrued interest. (Tr. 933; 944) For the interest to be reduced, it suggests that Hemet C had paid the accrued interest and therefore received credit for the notes. However, Hemet C had not made any payments on the accrued interest on these notes. *See* Tr. 948-49. Although Plaintiffs contend that it was always the parties' intention that the accrued interest on the assumed notes be credited to the purchase price for the trust's shares in Fourth, *see id.*, the fact remains that the May 14, 1997 agreement to reduce the amount due on the $251,000 note was not supported by any

1   consideration whatsoever.[15]

2

3       3.  Consideration Paid To The Susanne C. Ballantyne Trust

4

5       After the offsets described above, Hemet C owed the Susanne C. Ballantyne Trust

6   $71,361.68 in principal for Leeds and $229,324.24 in principal for Fourth.  Both of these

7   notes were immediately transferred to TPH.  (Joint Timeline at 36, 39)

8

9           i.  Note From Leeds Purchase

10

11       It is unclear how much of the consideration for the Leeds sale was actually realized

12  by the Susanne C. Ballantyne Trust.  Documents indicate that Hemet C repaid the full

13  $71,361.68 in principal to TPH on the Leeds note by September 9, 1997.  (Ex. 3142.03;

14  1043)  It appears to be Plaintiffs' position that because Hemet C fully made payments on the

15  note prior to the foreclosure sale, described below, and nearly all of the money that came

16  into TPH in 1997 was ultimately spent, Ms. Ballantyne realized the consideration from Hemet

17  C's purchase of Leeds.  See Tr. 1613-14; 1622-23.  Plaintiffs contend that in 1997, Ms.

18  Ballantyne    directed    approximately    $88,000    in    payments    from    TPH    to    the

19  Ballantyne-controlled bank account B&B 18 and to individuals and companies to which Ms.

20  Ballantyne owed money.  See Tr. 1621-22; Ex. 3142.02, 3142.04.

21       However, it appears to be impossible to determine which payments made by TPH can

22  be traced to funds generated by Hemet C's purchase of units of Leeds and Fourth.  TPH

23  received funds from a variety of sources, and Ms. Ballantyne appeared to use TPH as a

24

25       [15] On top of this $21,675.76 credit, it appears that an additional $66,000 was
26  immediately reduced from the $251,000 note due to an accounting error.  See Ex. 2034.02.
    A ledger made by Ms. Ballantyne documenting payments made on the note has an entry on
27  May 14, 1997 showing a payment of $66,000.  (Id.)  This amount represents the principal
    on the assumed notes, which had already been used to reduce the original $317,000
28  purchase price.  Ms. Ballantyne acknowledges that she had been double counting when the
    amount due on the note was again reduced by $66,000 and that Hemet C is still owed this
    amount.  (Tr. 1005-06)

personal bank account without adhering to formalities that could be used to identify how payments that came into TPH were spent. *See* Tr. 1616 ([Ms. Ballantyne:] "[T]he money that came in was being distributed out, and since it was my fund, I had . . . the checks going to whatever entities I authorized.")

Moreover, Ms. Ballantyne's records call into question Plaintiffs' assertion that $88,000 in distributions were made. $60,050 of this $88,000 is listed in TPH's general ledger under the heading "Notes Receivable." Ex. 3142.02; *c.f.* Tr. 1615-16. It appears that this cash leaving TPH was for a loan that would need to be repaid, not a distribution. *See* Tr. 1625-27. Additionally, the general ledger indicates that TPH made only a $500 distribution to the Susanne C. Ballantyne Trust that year; this distribution predates the first payment on the note from Hemet C. *See* Ex. 3142.03; 3142.04. The Susanne C. Ballantyne Trust's K-1 from TPH, in turn, reports $28,677 in distributions. (Ex. 4104.98) At a minimum, the Court finds that TPH failed to fully distribute the proceeds of Hemet C's note for the purchase of Leeds to the Susanne C. Ballantyne Trust in a verifiable manner.

ii. Note from Fourth Purchase

It is beyond dispute that only a fraction of the Hemet C note for the Susanne C. Ballantyne Trust's 98% interest in Fourth was ultimately distributed to the Susanne C. Ballantyne Trust. Hemet C made only $11,000 in payments on this note to TPH in 1997. (Ex. 2034.02; Tr. 1653-54) In October of 1997, the children's trust acquired TPH via the foreclosure, described below. Hemet C continued to make payments after this date, but because Ms. Ballantyne no longer had an ownership interest in TPH, she had no right to distribution of these funds. Accordingly, at most, Ms. Ballantyne realized only $11,000 of the $251,000 note paid by Hemet C to purchase her trust's shares in Fourth.

**H. The Foreclosure**

Pursuant to a private sale in October 1997, New Horizon Lighting, an entity owned by

08CV100; 08CV110 BTM (BLM)

1   the children's trusts and controlled by the Ballantynes' children, foreclosed on, *inter alia*, Ms.

2   Ballantyne's interest in TPH and personal property in the McCall street home that secured

3   two promissory notes from the Susanne C. Ballantyne Trust to Eastman.  This sale, like all

4   other transfers of the subject property at issue in this case, was the result of unnecessarily

5   complex transactions that can be briefly summarized: the Ballantynes' children foreclosed

6   on their parents; then, Ms. Ballantyne declined to foreclose on her children.  In this manner,

7   Mr. and Ms. Ballantyne engineered a sham foreclosure whereby their children foreclosed on

8   approximately $2 million of their assets, including nearly all the Fourth consideration, in order

9   to avoid creditor collection.

10

11       1.  The Eastman Loan

12

13       On November 1, 1991, the Susanne C. Ballantyne Trust borrowed $1,094,000 from

14   Eastman Investment, an entity owned and controlled by Ms. Ballantyne and her brother, Ed

15   Cramer.  (Joint Timeline at 4; Tr. 1548-49, 1720)[16]  Eastman had taken out loans from two

16   banks, $550,000 from Home Investment and Loan and $544,000 from Capitol Thrift & Loan

17   Association San Diego,  (Tr. 57, 1552), and then loaned these sums to the Susanne C.

18   Ballantyne Trust, in exchange for promissory notes ("Eastman note").  (Tr. 63, 1552; Ex.

19   3118.04, .05)  Although the notes did not indicate as much, it appears that while Eastman

20   repaid its loans to the bank, the Susanne C. Ballantyne Trust was expected to pay the same

21   amount to Eastman.  *See* Tr. 1566.  It also appears that despite having written notes setting

22   forth the terms of the repayment to Eastman, any changes in the terms of the underlying

23   repayment obligations Eastman had to the banks, such as a refinancing of the loan, were

24   directly applicable to the loan to the Susanne C. Ballantyne Trust, without any formal

25 _____

26       [16] Eastman investment was 80% owned by Cramer Investments and 20% by the
    Susanne T. Cramer Trust.  Ms. Ballantyne and her brother, Ed Cramer, each had 50%
27   interests in Cramer Investments.  Although by the time of the foreclosure sale, Ms.
    Ballantyne had transferred her beneficial interest in Cramer Investments, Ms. Ballantyne
28   retained her management rights in this company. *See* Tr. 1687-88; 1706-11.  Thus, at all
    times relevant to the events transpiring in this section, Ms. Ballantyne controlled 60% of the
    voting rights of this entity, and Mr. Cramer controlled the other 40%.

renegotiation between the trust and Eastman.  *See* Tr. 1634-35.

Ms. Ballantyne's notes to Eastman were secured by deeds of trust on the McCall and Fourth properties dated November 1, 1991. (Joint Transcript at  5, 6)  Plaintiffs contend that the Eastman loan was also secured by a security interest in all of the Susanne C. Ballantyne Trust's cash and personal property whether acquired contemporaneously or at any time subsequent to the security agreement, as evidenced by a UCC statement dated November 1, 1991.  (Tr. 1548-51, 1583-84; Ex. 3130)  This UCC statement was not recorded until May 4, 1995, four days before the start of the Ballantynes' tax court trial.  The deeds of trust were not recorded until June 8, 1995, less than one month after the trial's conclusion.  (Joint Timeline at 12)

Mr. Ballantyne testified that the reason for the more than three and a half year delay in recording these documents was that recordation would hinder Eastman's ability to obtain financing.[17]   (Tr. 61-62)  The Court is hard-pressed to discern a legitimate basis for this assertion.  Being able to show to lenders that this loan was secured would only enhance Eastman's ability to obtain future loans.  If Mr. Ballantyne was referring to the Susanne C. Ballantyne Trust's ability to obtain financing, then the only way recordation would hinder the trust's prospects is that the Ballantynes planned to hide the existence of the Eastman loan from future lenders.

Regardless, the Court finds that the timing of when these trust deeds were recorded provides the same circumstantial evidence that led to the conclusion that the initial transfers of the Leeds and Fourth properties were in anticipation of future tax liabilities.  Just as the Ballantynes transferred well over a million dollars in assets to closely-related entities that could not be readily traced back to them during the time period surrounding the tax court trial, they also encumbered their property interests in order to hinder future IRS collection

---

[17] The Ballantynes also contend that these interests were secured on this date at the behest of Ed Cramer, who was concerned with the Susanne C. Ballantyne Trust's ability to repay the Eastman note.  *See generally* Tr. 1664.  For reasons discussed in greater detail below, based on Mr. Cramer's subsequent actions, the Court does not find persuasive the explanation that Ed Cramer sought to have these documents recorded in order to protect his personal economic interests.  Mr. Cramer later agreed to a sale of the Eastman note to an entity that failed to make payments.  He then took no action on this entity's default.

1   efforts.

2        Three pledge agreements from this time period, dated July 10, 1995, provide further

3   evidence of the Ballantynes encumbering their assets during this time period.  (Ex. 5040,

4   5042, 5044)  With Ms. Ballantyne standing on both sides of these agreements, signing on

5   behalf of the Susanne C. Ballantyne Trust and Eastman Investment, the Susanne C.

6   Ballantyne Trust purported to pledge first security interests in Rhodes, TPH, and Fremont

7   to secure the Eastman notes.  (*Id.*)  These pledge agreements were signed more than three

8   and a half years after the loan was made and were not supported by any additional

9   consideration.   By pledging her interest in TPH, in particular, Ms. Ballantyne set up a

10  mechanism where she could transfer promissory notes with a face value of over $2 million

11  to her children without realizing consideration that could be readily seized by the IRS.  *See*

12  Tr. 1749-50.

13

14        2.  Transfer To Fulton 162, LP

15

16        Beginning in 1994, the Susanne C. Ballantyne Trust fell into arrears in its payments

17  to Eastman.  At the end of this year, the trust owed $65,883.90.  (Ex. 3137; Tr. 1583)  It

18  made payments in 1995 and paid the balance it owed in December of 1995.  (Tr. 1553)  No

19  payments were made, however, the following year, and by the end of 1996, the trust owed

20  $146,801.60.  (*Id.*; Ex. 3139; Tr. 1595)  Eastman took no collection action against the

21  Susanne C. Ballantyne Trust at that time.

22        On January 15, 1997, the Susanne C. Ballantyne Trust entered into an agreement

23  with Fulton 162, LP ("Fulton 162"), an entity owned by the children's trusts and controlled by

24  Mr. Ballantyne[18], (Tr. 1677, 1681), to have Fulton 162 make payments owed by the Susanne

25  C. Ballantyne Trust on the Eastman note.  (Joint Timeline at 33; Ex. 5073)  In exchange,

26  Fulton 162 received the trust's partnership interests in Investment Associates, LP

27  _____

28        [18] Fulton 162's general partner was Snow Valley.  As discussed above, Mr.
     Ballantyne, in his capacity as Vice President of Snow Valley exercised control over this
     entity.

("Investment Associates"), valued by the Ballantynes at $1,319,933.  (*Id.*)  As usual, the Ballantynes stood on both sides of the transaction, with Ms. Ballantyne signing on behalf of the trust and Mr. Ballantyne signing on behalf of  Fulton 162.

Fulton 162 failed to make a single payment on the Eastman note.  (Tr. 1773-74) Despite having transferred an asset that the Ballantynes valued at over $1 million in exchange for Fulton 162 taking over her trust's obligation to repay the Eastman loan, Ms. Ballantyne testified that she did not recall monitoring whether Fulton 162 was making payments to Eastman.  (Tr. 1646)  At a minimum, for more than eight months between Fulton 162 taking over the trust's loan payment obligations and the foreclosure, Ms. Ballantyne made no effort to ensure that Fulton 162 was honoring its end of the agreement. (Tr. 1646-49)  After she received notice in October 1997 that the Eastman note was in default, she took no action against Fulton 162 for its failure to make payments.  (*Id.*)  Mr. Ballantyne, in turn, who described himself as an advisor to the Susanne C. Ballantyne Trust and was Vice-President of Fulton 162 at the time, admitted that when Fulton 162 took over the loan, "I just knew that Fulton 162 didn't have the money, so they couldn't make the payments." (Tr. 1774)  Thus, the transfer of the Susanne Ballantyne Trust's obligation to make payments on the Eastman note clearly was not effectuated because Fulton 162 was in a superior position to make payments on the note.  To the contrary, the Court finds that the only business purpose for the agreement to have Fulton 162 take over payments on the Eastman note was to shift the Susanne C. Ballantyne Trust's interest in an asset the Ballantynes valued at $1.3 million from the Susanne C. Ballantyne Trust to their children without any intention of the trust benefitting from the transfer.

3.  Transfer Of Eastman Note To New Horizon

Pursuant to documents dated August 25, 1997 New Horizon Lighting, LC ("New Horizon"), a Utah manager-managed company owned by the children's trusts and managed

by the Ballantynes' daughter Laura and a Ballantyne-company called Mountain Living[19], purchased the Susanne C. Ballantyne Trust's note to Eastman and all securities pledged to secure the Eastman note (including the deeds of trust on the McCall and Fourth properties and the Susanne C. Ballantyne Trust's shares in TPH). *See* Tr. 1635; Ex. 3131.   In exchange, New Horizon provided Eastman with a note for the balance of the amount owed on the loan and secured this note with the same securities it had just received.  *See* Tr. 1601, 1637, 1770; Ex. 1042.04.   Thus, from Eastman's perspective, its protection from default on the Eastman note remained the same both before and after this transaction.  The same security that secured the loans from Eastman to the Susanne C. Ballantyne Trust secured the transaction between Eastman and New Horizon.

4. Foreclosure Sale

New Horizon sent the Susanne C. Ballantyne Trust a notice of default dated October 10, 1997. (Ex. 3085)[20]   New Horizon also sent four notices of private sale dated October 13, 1997, stating that it would sell the trust's interests in TPH, shares in Fremont, shares in Rhodes, and personal property to satisfy the trust's debt on the Eastman Loan.  (Ex. 3086)  Documents indicate that this foreclosure sale took place on October 23, 1997.  *See, e.g.*, 5031, 2037; *see also* Tr. 1141-42.  As a result of the foreclosure sale, the children's trusts acquired the Susanne C. Ballantyne Trust's interests in Rhodes, (Ex. 5031), Hemet C

---

[19] The children's trusts owned Mountain Living and Mr. Ballantyne and his children were officers of this company through the end of November 1997.  (Tr. 1706)

[20] This document was signed by William Dunster as "Manager" of New Horizon. However, the filed articles of incorporation for New Horizon that were operative on October 10, 1997 list only Laura Ballantyne and Mountain Living as managers. (Ex. 5113)  Under Utah law, managers must be specifically listed in articles of incorporation or amendments thereto.  Utah Code § 48-2c-804.  The certificate of amendment that actually added Mr. Dunster as a manager was dated November 24, 1997 and filed on January 28, 1998, both subsequent to the date of the foreclosure. Ex. 5113.06.  In response, Plaintiffs point to an unfiled version of the certificate of amendment listing Mr. Dunster as a manager dated prior to the foreclosure on September 3, 1997.  (Ex. 3127)  However, under Utah law, the controlling document is the January 28, 1998 version.  *See* Utah Code Ann. § 48-2c-208 (documents are not effective until filing).  Thus, Mr. Dunster did not have legal authority to act as a manager on behalf of New Horizon as of the date of the foreclosure sale.

purchased the trust's interest in TPH from New Horizon (Ex. 2037, 2039), and New Horizon obtained personal property in the Ballantynes' home, including a piano that had been in Ms. Ballantyne's family for decades (*See* Tr. 1141, 1156).

From the Ballantynes' perspective, nothing changed with respect to use of their property.  New Horizon did not foreclose on the Ballantynes' home, despite it being part of the security on the Eastman note.  *See* Tr. 1148; Ex. 3085.02.  Although New Horizon obtained Ms. Ballantyne's personal property, all the furniture in the house that was part of the foreclosure, including the piano, remained in the house after the sale.  *See* Tr. 1141-42. Ms. Ballantyne paid no increase in rent or any other consideration to New Horizon for the benefit of this personal property remaining in her home.

### 5.  Purpose Of The Sale To New Horizon And Foreclosure

The foreclosure sale and New Horizon's purchase of the Eastman note make no business sense other than to serve as a mechanism for Mr. and Ms. Ballantyne to defraud the IRS.  As noted above, following the sale of the Eastman note to New Horizon, Eastman was no more protected from default than it had been before the sale to New Horizon.  New Horizon, in turn, purchased this note with knowledge that Fulton 162 had not made payments for at least six months.  New Horizon then failed to make payments to Eastman, at least through 1998.  *See* Tr. 1637, 1639-40, 1772.  Eastman could have foreclosed on New Horizon at any time through this date, yet chose not to act on New Horizon's default.  Thus, the children's trusts were no more protected from having its properties foreclosed on than it had been prior to the foreclosure.  Yet, Ms. Ballantyne was able to transfer the assets held in TPH to her children without realizing any consideration that could be attached by the IRS.

The Ballantynes' alternative explanation for the purpose of the sale to New Horizon and the foreclosure is unsupported by the evidence presented at trial.  Mr. Ballantyne testified that the sale of the Eastman note to New Horizon and the foreclosure were effectuated at Ed Cramer's behest because of Mr. Cramer's concerns about the Susanne

C. Ballantyne Trust's ability to repay the Eastman loan in 1997. *See* Tr. 1670-73.

The Court finds this explanation unpersuasive for several reasons. First, for several months prior to the sale to New Horizon and the foreclosure, Fulton 162, and not the Susanne C. Ballantyne Trust, had been responsible for repaying the obligation on the loan. Per the terms of the agreement between Fulton 162 and the Susanne C. Ballantyne Trust, from January 1997 onward, the trust's ability to make ongoing payments on the loan should have been irrelevant.

Second, Mr. Cramer held a minority of the voting shares of Eastman, with Ms. Ballantyne holding 60% of the decision-making power of this entity. The Ballantynes claim that Ms. Ballantyne was conflicted out of any decisions regarding the Eastman loan. (Tr. 1682, 1710-11) However, this position is contrary to the evidence. Ms. Ballantyne had taken a role with respect to the Eastman loan both before and after the foreclosure. Ms. Ballantyne was involved in the decision by Eastman to lend money to the Susanne C. Ballantyne Trust in the first place. *See* Tr. 1763. She was the sole signatory on behalf of Eastman on the July 10, 1995 pledge agreements, (Ex. 5040, 5042, 5044), as well as a December 1996 modification on the Eastman loan (Ex. 5036). Moreover, Ms. Ballantyne acknowledged that she was involved in the decision to not foreclose on New Horizon after New Horizon failed to make payments on the Eastman note. (Tr. 1639-43)

Finally, Mr. Cramer, through his position in Eastman, did not demand that Eastman take readily available action that would allow it to recover all or almost all of the deficiency on the Eastman note. At trial, Mr. Ballantyne testified that Mr. Cramer did not want Eastman to foreclose because the pledged securities were supposedly insufficient to cover the debt on the Eastman note. *See* Tr. 1675. However, it appears that had Eastman foreclosed on all the pledged securities it could have satisfied the debt.

Mr. Ballantyne testified that at the time of foreclosure sale, the total outstanding obligation on the Eastman note was $1.3 million. (Tr. 1728) The sale generated $918,000, and thus, there was an approximately $400,000 deficiency. (*Id.*) However, New Horizon chose not to foreclose on the McCall and Fourth property interests. Had Eastman done so,

26

a foreclosure sale would likely have covered the outstanding obligation on the Eastman note, even assuming deterioration in the condition of the McCall property due to lack of repairs. *See generally* Ex. 1030, 5085, 5087 ($975,000 appraisal of McCall property less mortgages on property for $700,000, which by 1997, appear to have been partially paid off[21]); Ex. 2015 (Mr. Ballantyne's June 1997 estimate of a $317,000 market value for the Fourth property). Even if foreclosing on the McCall and Fourth properties (as well as any other property secured by the November 1, 1991 UCC statement) would not have fully closed this deficiency, had Eastman directly foreclosed on all security pledged to secure the Eastman note, it could have minimized its losses on its loan.  Contrary to the Ballantynes' testimony, the Court finds that Mr. Cramer failed to take independent action on behalf of Eastman that was adverse to the wishes of Mr. and Ms. Ballantyne.

## II. CONCLUSIONS OF LAW

The success of Plaintiffs' quiet-title actions turn on whether Plaintiffs are nominees of the taxpayers, Mr. and Ms. Ballantyne.  Under 26 U.S.C. § 6321, "[i]f any person liable to pay any tax neglects or refuses to pay the same after demand, the amount … shall be a lien in favor of the United States upon all property and rights to property, whether real or personal, belonging to such person."  "Property," for purposes of § 6321, includes property held by a third party if it is determined that the third party is holding the property as a nominee of the taxpayer.  *See United States v. Carter*, No. 08cv1633 BEN (AJB), 2010 U.S. Dist. LEXIS 52732, at *5 (S.D. Cal. 2010).  Thus, if Plaintiffs are nominees of the Ballantynes as of the dates of the June 30, 1997 and November 16, 1998 assessments ("second assessment" and "third assessment" respectively), Plaintiffs' quiet-title action fails.

The first assessment for the 1990 tax year occurred prior to the transfer of the McCall and Fourth properties to Plaintiffs.  Under 26 U.S.C. § 6323, tax liens are not effective against certain third-party purchasers of property, who have paid "adequate and full

---

[21] *See* Pl. Trial Br. Attachment VIII.

1   consideration." *Gorospe v. Comm'r of Internal Revenue*, 451 F.3d 966, 967 (9th Cir. 2006);

2   26 U.S.C. § 6323(a); § 6323(h)(6).  However, as this Court held previously, nominees of the

3   taxpayer are not entitled to the protections of this statute.   August 10, 2010 Order On

4   Motions For Summary Judgment at 14 [hereafter "MSJ Order"]; *see also United States v. N.*

5   *States Invs., Inc.*, 670 F. Supp. 2d 778, 786 n.21 (N.D. Ill. 2009).   Thus, if the Court

6   concludes that Plaintiffs are nominees of the Ballantynes as of the date of the initial transfer,

7   Plaintiffs cannot quiet title as to the January 2, 1995 tax assessment ("first assessment").[22]

8        "A nominee is one who holds bare legal title to property for the benefit of another."

9   *Scoville v. United States*, 250 F.3d 1198, 1202 (8th Cir. 2001)  (citing *Black's Law Dictionary*

10  (7th ed. 1999)).   The Court looks to state law to determine if Plaintiffs are the nominees of

11  the Ballantynes.  *See United States v. Craft*, 535 U.S. 274, 278 (2002).   Although California

12  law recognizes the theory of nominee ownership, it appears that no California court has ever

13  identified the factors involved in a nominee analysis.   *See* MSJ Order at 7.   Accordingly, it

14  is the task of the district court to best predict how the California Supreme Court would

15  resolve this issue.  *Adam v. United States*, 400 Fed. Appx. 175, 176 n.1 (9th Cir. 2010).   To

16  do so, a court should look to "'intermediate appellate court decisions, decisions from other

17  jurisdictions, statutes, treatises, and restatements.'"  *Id.* (quoting *Eichacker v. Paul Revere*

18  *Life Ins. Co.*, 354 F.3d 1142, 1145 (9th Cir. 2004)).

19  //

20

21      [22] Plaintiff Leeds asserts, without relying on any authority, that "the nominee analysis
     applies only where the alleged nominor owned *something* the USA could have collected
22   which can be directly traced to the eventual purchase/acquisition of the nominee-held
     property."  [Dock. # 162 at 2 (emphasis in original)].  Plaintiff contends that because the
23   McCall property was owned by the Susan T. Cramer trust, and not the Ballantynes, prior to
     the transfer to Leeds, "the [nominee] lien could never have arisen."  [*Id.* at 2]

24      The legal premise of this argument is doubtful.  "It is not necessary that the taxpayer
     ever hold title to the property in its own name in order for the IRS to levy against it."  *Colby*
25   *B. Found. v. United States*, No. 96-3073-CO,1997 U.S. Dist. LEXIS 17698, at *57-58 (D. Or.
     1997).  Factually, however, the assertion that the Susan T. Cramer Trust was an entity that
26   operated independently from the taxpayers is meritless.  Ms. Ballantyne was the trustee and
     sole beneficiary of the Susan T. Cramer Trust, and the Susanne C. Ballantyne Trust's
27   Declaration of Trust lists the Susan T. Cramer Trust as one of its assets.  Immediately after
     the Susan T. Cramer Trust transferred the McCall property to Leeds in exchange for limited
28   partnership units, the Susan T. Cramer Trust transferred its partnership units to the Susanne
     C. Ballantyne Trust without any consideration in return and with Ms. Ballantyne signing on
     behalf of both entities in the transaction.  (Ex. 1018)

The Ninth Circuit recently affirmed the use of a six factor-test first articulated in *Towe Antique Ford Found, v. IRS*, 791 F. Supp. 1450, 1454 (D. Mont. 1992) to determine if property is held as a nominee. *United States v. Wheeler*, 403 Fed. Appx. 301, 302 (9th Cir. 2010). These relevant factors in a nominee analysis are:

(a) No consideration or inadequate consideration paid by the nominee;

(b) Property placed in the name of the nominee in anticipation of a suit or occurrence of liabilities while the transferor continues to exercise control over the property;

(c) Close relationship between transferor and the nominee;

(d) Failure to record conveyance;

(e) Retention of possession by the transferor; and

(f) Continued enjoyment by the transferor of benefits of the transferred property.

*Towe Antique Ford Found.*, 791 F. Supp. at 1454.

The Court looks to this test for guidance, as has several district courts in California. *See, e.g.*, *U.S. v. Beretta*, No. C 07-02930, 2008 U.S. Dist. LEXIS 93430, at *20 (N.D. Cal. Nov. 11, 2008); *Sequoia Prop. & Equip. Ltd. P'ship v. United States*, 2002 U.S. Dist. LEXIS 20043, at *33 (E.D. Cal. September 19, 2002); *United States v. Bell*, 27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998). However, as discussed below, several of these courts, as well as learned commentators, have identified the issues of intent and control as separate considerations in the nominee analysis. In light of these authorities, and the absence California case law identifying relevant nominee factors, the Court predicts that the California Supreme Court would interpret the second *Towe* factor as raising two distinct issues. First, as reflected by the *Towe* court's consideration of whether the property was placed in the name of the nominee in anticipation of suit, the taxpayers' intent in transferring the property is relevant to the nominee analysis. *See Beretta*, 2008 U.S. Dist. LEXIS 93430, at *20 (N.D. Cal. Nov. 11, 2008) ("The factors relevant to determination of nominee status are essentially the same as those used to determine fraudulent intent."); Stephanie Hoffer, et al., *To Pay or Delay: The Nominee's Dilemma Under Collection Due Process*, 82 Tul. L. Rev. 781, 818 (2008) ("In both nominee and fraudulent conveyance situations, a delinquent taxpayer has transferred property to a third party in order to evade the [Internal Revenue] Service's

1   collection action."); *United States v. Carter*, No. 08cv1633, 2010 U.S. Dist. LEXIS 52732, at

2   *6 (S.D. Cal. 2010) (nominee status where "the purported transfer was made to avoid tax

3   liabilities from earlier tax years").  Second, the degree of control exercised by the taxpayer

4   over the entity and the assets held by the entity is a distinct, and, as some authorities

5   recognize, central element of the nominee analysis.  *See* Elizabeth K. Berman, 2 MERTENS

6   LAW OF FED. INCOME TAX'N § 17:21 (2011) ("Many courts use various factors in evaluating

7   nominee questions. The essence of the issue is whether and to what degree the person

8   exercises control over the nominee and assets held by the nominee."); *United States v. Bell*,

9   27 F. Supp. 2d 1191, 1195 (E.D. Cal. 1998) ("Nominee status is determined by the degree

10  to which a party exercises control over an entity and its assets."); *Sequoia Prop. & Equip.

11  Ltd. P'ship v. United States*, 2002 U.S. Dist. LEXIS 20043, at *32-33 (same).[23]

12       The Court looks to the totality of the circumstances in its nominee analysis; the

13  presence or absence of one single factor is not dispositive.  *911 Mgmt., LLC v. United

14  States*, 657 F. Supp. 2d 1186, 1195 (D. Or. 2009).  The government bears the burden of

15  proving that Plaintiffs are a nominee of the Ballantynes by a preponderance of the evidence.

16  *See United States v. N. States Invs., Inc.*, 670 F. Supp. 2d 778, 785 (N.D. Ill. 2009).

17       Each of the nominee factors will be addressed in turn.

18

19  **A.  Adequacy Of Consideration**

20

21       As an initial matter, Plaintiffs strenuously argue that because the McCall and Fourth

22  properties were pledged to secure the Eastman loan, these properties were underwater and

23  essentially valueless and that because Leeds and Fourth accepted valueless property, they

24  cannot be the taxpayers' nominees.  This argument is both legally and factually deficient.

25  _____

26  [23] Plaintiffs' assertion that "control is not a nominee factor" (Pl. Post-Trial Br. at 20)
    is clearly incorrect.  The very quote relied upon by Plaintiffs in support of this position reads
27  in full, "A 'nominee' is a person or entity who holds legal title to property that in truth belongs
    to another who exercises control over and realizes the benefit of it. 'Nominee status is
28  determined by the degree to which a party exercises control over an entity and its assets.'"
    *Sumpter v. United States*, 302 F. Supp. 2d 707, 720 ( E.D. Mich. 2004) (quoting *Bell*, 27 F.
    Supp. 2d at 1195).

1    Legally, Plaintiffs cite no authority to support the proposition that lack of value of

2  transferred property defeats nominee status.  Such a position is especially dubious where,

3  as here, it is the taxpayers themselves who pledged the transferred property to secure a loan

4  for their benefit.

5    Factually, the use of the McCall and Fourth properties to secure the Eastman loan did

6  not render these properties valueless.  Ms. Ballantyne controlled 60% of the voting rights in

7  Eastman from the time of the origination of the loan through the tax assessment dates.

8  Contrary to the Ballantynes' testimony, she was not conflicted out of decisions regarding

9  loaning money from Eastman to the Susanne C. Ballantyne Trust.  Had the Ballantynes so

10  chosen, they could have released the properties from serving as security on the Eastman

11  note.[24]  Thus, the McCall and Fourth properties could have been sold to an unaffiliated third

12  party in an arms-length transaction without the Eastman note rendering the property

13  "unmarketable" and "of no commercial value."  (Pl. Post-Trial Br. at 6)

14

15    1.  Initial Transfer

16

17    The McCall and Fourth properties were transferred to Leeds and Fourth in exchange

18  for partnership units.  Exchange of property for equivalent equity in a limited partnership

19  constitutes adequate consideration.

20

21    2.  Second Assessment

22

23    However, the consideration exchanged in the initial transfer does not end the inquiry

24  with respect to the second and third assessments.  Prior to these assessment dates, Ms.

25  Ballantyne transferred her partnership interests in Leeds and Fourth to Hemet C., an entity

26  owned by her children's trusts.  This transaction prevented the Ballantynes from realizing

27

28    [24] In fact, when the foreclosure occurred, at the private sale conducted by New Horizon, these assets were not ultimately foreclosed upon.

1   adequate consideration from the transfer of the McCall and Fourth properties.

2         In connection with the sale to Hemet C, Mr. Ballantyne valued Ms. Ballantynes' 98%

3   interests in Leeds and Fourth at $323,070 and $317,000 respectively.[25] (Ex. 1026, 2015; Tr.

4   130-32, 342-47) Taking these valuations as the true value of the property, the consideration

5   paid by Hemet C still was not adequate.

6         The $323,070 Leeds purchase price was immediately reduced by Hemet C's

7   assumption of $251,638.32 in unsecured promissory notes purportedly owed by the

8   Susanne C. Ballantyne Trust.  The Fourth purchase price, in turn, was reduced by the

9   assumption of $66,000 in unsecured notes owed by the Susanne C. Ballantyne Trust and

10  Ms. Ballantyne individually.  These offsets were for the full face value of the notes and in the

11  case of notes to the children's trust in the Leeds sale, for accrued interest, as well.

12        However, applying a method of valuation endorsed by Mr. Ballantyne, the face value

13  of unsecured promissory notes does not accurately reflect their value.  In the context of

14  providing a valuation for the foreclosure sale, Mr. Ballantyne testified that even though TPH

15  held notes with a face value of about $2.2 million, these notes collectively were only worth

16  $912,000 because, "They are all unsecured. They are very undesirable notes."  (Tr. 1755-

17  56)

18        Reducing the purchase price by the face value of unsecured promissory notes was

19  especially inappropriate in this context.  All of the assumed notes were in default without any

20  apparent collection efforts made on behalf of the note holders as of the time of sale to

21  Hemet C.  For most notes, if not all of them, not a single payment of principal or interest had

22  been made prior to the sale.  With respect to notes used to offset Hemet C's purchase of the

23  Leeds partnership units, the vast majority were from companies that had been out of

24  business for more than three years, and further, it does not appear that Ms. Ballantyne had

25  a legal obligation to repay them.  With respect to Fourth, $40,000 of the $66,000 in assumed

26  notes arose from a wholly circular transaction where Ms. Ballantyne had paid her children's

27

28        [25] Incidentally, Mr. Ballantyne did not take the Eastman note into account when performing these valuations, further calling into question Plaintiffs' position that the Eastman note rendered the subject properties valueless.

08CV100; 08CV110 BTM (BLM)

1  trusts $40,000 the same day the children's trusts loaned her $40,000.  Moreover, with Mr.

2  and Ms. Ballantyne standing on both sides of the transaction[26], an agreement was

3  subsequently reached to reduce the amount due on the Fourth note by additional $21,675.76

4  to reflect the accrued interest on the assumed notes.  (Ex. 2032)  This agreement was not

5  supported by any consideration whatsoever.

7      3.  Third Assessment

9      Although these improper offsets, alone, render consideration from the transfer of the

10  McCall and Fourth properties inadequate as of the second and third assessment dates, the

11  sham foreclosure[27] that took place between the second and third assessments provides

12  further support for this conclusion.  As described above, Ms. Ballantyne had transferred the

13  notes owed on Hemet C's purchase of her shares in Leeds and Fourth to TPH.  TPH, in turn,

14  was the primary asset foreclosed upon by New Horizon in the October 1997 foreclosure.

15      Of the $229,324.24 owed on the Fourth note, after the improper offsets, only $11,000

16  had been paid to TPH as of the date of foreclosure.  Thus, at a maximum, only 5% of this

17  note could have been actually distributed to the Susanne C. Ballantyne trust as of the third

18  assessment date.[28]   For these reasons, the Court concludes that inadequacy of

19  consideration supports a holding of nominee status with respect to the second and third

[26] Mr. and Ms. Ballantyne stood on both sides of all the transactions related to Hemet C's purchase of the Susanne C. Ballantyne Trust's shares in Leeds and Fourth. *See also* Ex. 1028, 2017.  The fact that these transactions were not arms-length provides further reason to question the adequacy of consideration used by Hemet C to purchase these shares.

[27] Plaintiffs contend that the Court allowed evidence of the foreclosure as relevant to a government claim of conspiracy. Pl. Trial Br. at 23.  This contention is clearly incorrect. As stated in the Court's January 21, 2011 Order, the Court allowed evidence of the foreclosure sale because of its relevance to the nominee analysis. The foreclosure provides further evidence of the Ballantynes' intent to avoid IRS collection in affecting the transfers of the subject properties and is one of the reasons why consideration from the Fourth sale was inadequate.

[28] With respect to the Leeds note, while documents indicate that Hemet repaid the $71,361.68 in principal prior to the foreclosure, TPH's records do not indicate how much of this note was actually distributed to the Susanne C. Ballantyne Trust.

33                                08CV100; 08CV110 BTM (BLM)

1   assessment dates.

2

3   **B.  Intent In Transferring Subject Properties**

4

5       The Ballantynes' intent to defeat IRS attempts to collect on their tax liability favors a

6   finding that Plaintiffs are the Ballantynes' nominees.  As evidenced by the initial transfers of

7   the McCall and Fourth properties, the Ballantynes sought to blunt the potential impact of an

8   unfavorable  tax  court  decision  by  transferring  assets  to  entities  that  they  owned  and

9   controlled.   During  this  time  period,  the  Ballantynes  also  encumbered  their  assets  by

10  recording deeds of trust on the McCall and Fourth properties and a UCC statement that

11  purported to pledge virtually all of their assets, in order to secure a loan that had been made

12  three  and  a  half  years  earlier.   These  initial  transfers  and  encumbrances  allowed  the

13  Ballantynes to cloud the ownership of the McCall and Fourth properties in the eyes of third

14  party creditors, such as the IRS, while at the same time retaining control over and benefits

15  from the subject properties.

16      Approximately a year and a half later, at a time when the Ballantynes' tax liability

17  appeared to be more certain, the Ballantynes sought to transfer their assets, including their

18  interests in Leeds and Fourth, to their children in a manner that would minimize the amount

19  of consideration that they received that could be attached by the IRS.  Although the

20  Ballantynes could have gifted these assets to their children outright, they instead chose to

21  engage in a series of complex transactions, including a sham foreclosure, that would further

22  obscure their intimate involvement in these properties.  All of these transactions were made

23  for the purpose of avoiding substantial tax liabilities.

24      This intent to defraud the IRS impacts other areas of the nominee analysis.  Because

25  the Ballantynes sought to prevent the IRS from reaching their assets, they affected transfers

26  in ways to avoid retaining any consideration, impacting the adequacy of consideration factor.

27  Moreover, although the Court finds that the Ballantynes retained substantial benefits as of

28  the dates of assessments, most notably their ability to continue to live in the McCall property

34

without adhering to basic lease terms, a less tangible benefit relevant to both properties was their ability to transfer their assets to their children without interference from the IRS.

## C.  Control Over Subject Properties

### 1.  Initial Transfer

Both the McCall and Fourth properties were transferred into entities wholly owned and controlled by the Ballantynes.  The Ballantynes clearly controlled both Leeds and Fourth as of the date of the initial transfer.

### 2.  Second Assessment

As of the date of the second assessment, Hemet C had acquired Ms. Ballantyne's limited partnership units in Leeds and Fourth.  However, Ms. Ballantyne continued to maintain control over Leeds and Fourth, as the owner of Rhodes, the general partner of these entities.  *See* Ex. 1014.018, .0222 (Leeds partnership agreement providing that "[t]he management and control of the Partnership and its business and affairs shall rest exclusively with the General Partner" and that "Limited Partners shall take no part in . . . the control conduct or operation of the Partnership"); Ex. 2007.018, .022 (Fourth partnership agreement providing same); *see also* Cal. Corp. Code § 15901.10 ("[T]he partnership agreement governs relations among the partners and between the partners and the partnership.").[29]

### 3.  Third Assessment

As of the date of the third assessment, Ms. Ballantyne resigned her positions in

_____

[29] At closing argument, Plaintiffs emphasized a provision of these limited partnership agreements stating that limited partner approval is required for the sale or transfer of a substantial part of the partnership interest.  However, there was no convincing evidence at trial that anyone other than Mr. and Ms. Ballantyne played a significant role in the decisions to  transfer the Susanne C. Ballantyne Trust's shares in Leeds and Fourth to Hemet C.  Moreover, even if Hemet C, the limited partner, had exercised this power, Mr. Ballantyne controlled Hemet C at least through the date of the second assessment.

Rhodes and thus lacked legal authority to make decisions on behalf of Leeds and Fourth. However, as set forth above, for all intents and purposes, Ms. Ballantyne continued to perform the same tasks and serve in the same role with respect to Leeds and Fourth after her resignation.  Thus, the control factor favors a holding of nominee status with respect to the third assessment and strongly favors such a holding with respect to the first and second assessments.

**D.  Closeness In Relationship Between Transferor And Nominee**

All of the relevant entities were owned and controlled by the Ballantynes, their children, their children's trusts, and/or Ms. Ballantyne's brother, Ed Cramer.  Mr. Dunster, the trustee of the children's trusts, was not an independent trustee, but rather a long-time business associate and confidant of the Ballantynes.  Moreover, Mr. Dunster's authority was limited.  For much of the time relevant to the events at issue, Mr. Ballantyne effectively controlled Snow Valley, the general partner of Hemet C, the entity owned by the children's trusts that eventually held nearly all of the partnership interests in Leeds and Fourth.

Of the multitude of transactions introduced at trial, few, if any, were arms-length. Indeed, Mr. and Ms. Ballantynes stood at both ends of virtually every transaction relevant to the transfer of the McCall and Fourth properties.  *See, e.g.*, Ex. 1009.03 (lease between Leeds and Mr. Ballantyne), Ex. 1028 (agreement by Hemet C to purchase Ms. Ballantyne's shares in Leeds), Ex. 2017 (agreement by Hemet C to purchase Ms. Ballantyne's shares in Fourth).  This close relationship between Plaintiffs, the Ballantynes, and numerous other entities introduced at trial strongly favors a holding of nominee status.[30]

---

[30] Plaintiffs' assertion that the close relationship of the children's trusts and the taxpayers "argues against nominee status" (Pl. Post-Trial Br. at 16) lacks merit.  Unlike *Spotts v. United States*, 429 F.3d 248, 253 n.2 (6th Cir. 2005), the case relied upon by Plaintiffs, the property at issue here is not of the type where the alleged nominee and alleged true beneficial owner "simultaneously act as true owners", such as what may be the case with home ownership between a married couple. *Id.*  The transfer of property from taxpayers to a trust, of which the beneficiaries are the taxpayers' children is a sufficiently close relationship to support a finding of nominee status.  *See United States v. Marsh*, 114 F. Supp. 2d 1036 (D. Haw. 2000).

1  **E.  Failure To Record Transfers**

2

3       The grant deed for the McCall property was not recorded until July 9, 1997, over two

4  years after the transfer to Leeds.  (Ex. 1016)  The June 30, 1995 conveyance to Fourth was

5  not recorded until October 2, 1995.  (Ex. 2008)

6       Although the Court does not find this factor to be particularly controlling in this case,

7  the delay in recordation of the McCall property provides some support for a holding of

8  nominee status.  The delay in recordation of the Fourth property is not as excessive and

9  therefore, does not impact the Court's nominee analysis.

10

11  **F.  Retention Of Benefit And Possession Of Properties**

12

13       The Ballantynes continued to live in the McCall property after the initial transfer

14  through the dates of the second and third assessments.  Although Plaintiffs argue that this

15  arrangement was proper because the Ballantynes lived in their home pursuant to a lease

16  with Leeds, the Ballantynes did not adhere to basic terms of the lease, such as timely

17  payment of the rent.  The Ballantynes continued possession of their home strongly supports

18  the conclusion that Leeds was their nominee.

19       The Ballantynes retention of benefits from the Fourth property is less obvious, at least

20  with respect to the second and third assessments.  For more than six months after the

21  transfer to Fourth, rental income from the Fourth property's tenant was paid to Mr. Cramer

22  to satisfy a personal debt that Ms. Ballantyne owed to him.  Although prior to the second and

23  third assessments, Ms. Ballantyne directed that future rental payments be made to Fourth,

24  Ms. Ballantyne effectively retained the power to alter how Fourth property's income stream

25  could be assigned after the transfer to Fourth.  Moreover, as noted above, less tangibly, Ms.

26  Ballantyne retained the benefit of transferring her interest in this property to her children in

27  a manner that she believed would insulate it from IRS collection attempts.  Accordingly, the

28  ————————————————

08CV100; 08CV110 BTM (BLM)

retention of benefit factor favors a holding of nominee status for Fourth, as well.

### III.  CONCLUSION

Balancing the nominee factors, the Court concludes that the government has met its burden of establishing that Plaintiffs were nominees of the Ballantynes as of the date of initial transfer and as of the dates of the second and third tax assessments.

Because Plaintiffs were nominees of the Ballantynes as of the date of the initial transfer, the protections of 26 U.S.C. § 6323(a) do not apply.  Plaintiffs cannot quiet title with regard to the first tax assessment made in January of 1995.  Defendant's Rule 50 motion on this issue is **DENIED**.

Because Plaintiffs were nominees of the Ballantynes as of the date of the second and third assessments, assets held by Plaintiffs as of these dates constitute property that is subject to the government's federal tax lien against Plaintiffs.  Plaintiffs cannot quiet title with regard to the second and third tax assessments made on June 30, 1997, and November 16, 1998.

For these reasons, the Court **FINDS IN FAVOR OF THE UNITED STATES AND AGAINST PLAINTIFFS LEEDS LP AND FOURTH INVESTMENT LP**.

**IT IS SO ORDERED.**

DATED:  August 5, 2011

Honorable Barry Ted Moskowitz
United States District Judge